Lawrence J. Bracken, J.
The within actions and proceedings seek to restrain, set aside and enjoin certain orders of the Commissioner of Environmental Conservation, which orders have directed the closing of certain areas to the harvesting of shellfish on public health grounds pursuant to ECL 13-0307, and which areas are located in Huntington Harbor, Town of Huntington, Setauket Harbor and Conscience Bay, Town of Brookhaven, and certain sections of the Great South Bay, located in the Towns of Babylon, Islip and Brookhaven. The court would also note as an aside that the said orders further open certain grounds to the harvesting of shellfish. The trial of these actions and proceedings was conducted July 6, 7, 8, 11 and 12, 1977 and pursuant to the stipulation of all parties, the prior stenographic record of a certain hearing with respect to plaintiffs’ request for a preliminary injunction, held June 3, 1977 et seq., together with the exhibits admitted in evidence, became part of the stenographic trial record of the plenary action.
The complaint by the individual plaintiffs in Action No. 1 seeks a judgment declaring the actions of the defendants to be unconstitutional, illegal, arbitrary, capricious and an abuse of discretion; plaintiffs further seek a permanent injunction preventing the closing for the harvesting of shellfish of the waters of the Great South Bay adjacent to the Town of Babylon.
In the second action, brought by the Towns of Babylon, Islip, Huntington and Brookhaven, plaintiffs seek a judgment which would order the suspension of the utilization of the coliform test in that such test is alleged to be scientifically and legally invalid; that the actual data accumulated by such *605 testing by the defendants be declared null and void in that it was not gathered by scientific procedures and that such collection procedure was in violation of the Environmental Conservation Law and the regulations of the Commissioner of Environmental Conservation.
In addition, the municipal plaintiffs seek direction of this court to order an immediate development of a new testing procedure; that the State co-operate with the Suffolk County Health Department in the obtaining of random samplings of shellfish during the drafting of such new standards as a transitional substitute for the coliform testing procedures. They further seek a direction of this court ordering the Commissioner of Environmental Conservation to effectuate changes in the Federal and interstate standards to protect the interstate sale and shipment of shellfish from the waters of the Great South Bay in the immediate future.
The municipal plaintiffs finally seek an injunction based upon their allegation that 6 NYCRR 41.3 (b) (1) is violative of the State Administrative Procedure Act and other articles of the Environmental Conservation Law. Specifically, the complaint alleges that the commissioner’s action was illegal in the following respects:
(1) That there was no notice given nor was there any public hearing held prior to the order of the commissioner, which order, effective May 20, 1977, directed the closing of approximately 1,497 acres to shellfish harvesting in the Great South Bay;
(2) That the commissioner failed to follow the requirements of ECL article 8, State Environmental Quality Review Act, and that he failed to prepare a necessary environmental impact statement; failed to conduct a public hearing with respect to such statement; and also failed to comply with the procedures of the State Administrative Procedure Act with respect to the notice of hearing with respect to his action;
(3) That the commissioner failed to comply with requirements of ECL 17-0301 in that he failed to give notice of a public hearing;
(4) That all defendants failed to comply with the requirements of ECL 13-0307 in that at no time was there a testing of the "shellfish lands”; that all tests were coliform tests taken from water samples of the affected area and that the coliform testing is neither scientifically nor legally valid.
*606 At the threshold, the plaintiffs’ claims with respect to certain procedural deficiencies must be considered. The initial argument of plaintiffs is that said State Administrative Procedure Act (L 1975, ch 167, as amd by L 1976, ch 935, eff Sept. 1, 1976) and specifically subdivision 2 of section 202 of the State Administrative Procedure Act was violated in that no public hearing was conducted prior to the issuing of the commissioner’s orders on May 6, 1977; a further claim is made that the failure to observe statutory provisions contained in ECL 8-0109 with respect to notification and public hearing, where an environmental impact statement was involved, constituted a further procedural deficiency, and that on these procedural grounds alone, the said orders, effective May 20, 1977, should be set aside and the defendants directed to conduct public hearings concerning the necessity for such proposed closing of shellfish lands.
In reviewing the underlying rationale and purpose of the said State Administrative Procedure Act, it is apparent that the purpose of the act is to establish uniformity among the various agencies of this State insofar as the developing of suitable procedural safeguards determined to be necessary when viewed in the light of such agencies’ statutory responsibilities. I am not persuaded, however, that the act in question, and more specifically, section 202 thereof, creates an abolute right to a public hearing in all actions by administrative agencies. It is designed to establish a consistent and uniform method of notice and hearing for administrative rule making, adjudication and licensing processes among the agencies of New York State Government (State Administrative Procedure Act, § 100).
The commissioner’s orders issued May 6, 1977, although included in the Official Compilation of Codes, Rules and Regulations of the State of New York by amendment to 6 NYCRR 41.3 are not within the definition contained in section 102 (subd 2, par [a], cl [i]) of the State Administrative Procedure Act). Said orders are not a "statement, regulation or code of general applicability that implements or applies law, or prescribes the procedure or practice requirements of any agency, including the amendment, suspension or repeal thereof’. ECL 13-0307 mandated the issuance of the commissioner’s orders designating the shellfish lands herein as uncertified.
It is apparent that ECL 13-0307 providing for sanitary *607 surveys and certification of shellfish waters makes no provision for any notice of public hearing. It provides merely for the publication of such certification as giving proper notice of the commissioner’s actions. I hold, therefore, that in this particular instance the said State Administrative Procedure Act is inapplicable.
The plaintiffs further contend, however, that the acts of the defendants are violative of the Environmental Quality Review Act (L 1975, ch 612, eff Sept. 1, 1976). Specifically, they assert that the provisions of ECL 8-0109 were violated in that the environmental impact statement, or in this case, a negative environmental impact statement, was subject to the notice and hearing requirements of that statute. It is asserted that under ECL 8-0105 the act in question applies to any State or local agency and that, the Department of Environmental Conservation is a State agency; that, therefore, the department was obligated to give notice and conduct public hearings with respect to the orders of the commissioner prior to their becoming effective.
There is no doubt that in this instance the commissioner filed a negative impact statement. In accordance with ECL 8-0113 the department has established necessary rules and regulations governing the filing of such environmental impact statements (6 NYCRR 615.1 et seq.). Both the statutory standards and the general rules and regulations direct the conducting of such environmental review of any actions to be undertaken by the said department, and, in addition, provide for the filing of negative declarations (see 6 NYCRR 618.7 [b], [c]).
The department asserts, however, that the orders of the commissioner do not constitute "actions” but fall within the purview of excluded acts, ECL 8-0105 (subd 5, par [ii]), since his official acts of certifying waters pursuant to ECL 13-0307 are ministerial in nature and involve no exercise of discretion with respect to certifying shellfish lands. This is not an instance where an agency is dealing with policy regulations or procedure making in the true sense; in essence, we are dealing with a statutory mandate imposed upon the commissioner with respect to an absolute obligation to determine for public health reasons whether or not certain shellfish lands are suitable for the harvesting of shellfish therefrom. The legislation in question, embodied in ECL article 8, is clearly addressed to the issue of preserving environmental, human, and *608 community resources of the State; it does not concern itself with any of the issues of public health and safety which are involved in those sections contained in ECL article 13, dealing with the certification of shellfish lands (see ECL 8-0113, subd 2, par [b], as amd, eff June 10, 1977).
Even if it were to be determined that ECL article 8 would apply to such acts as are involved here, we would note that the Department of Environmental Conservation is charged with the responsibility of assessing environmental consequences of various actions by all State and local agencies. The department claims that it is exempt from the necessity of preparing any environmental impact statement involving its own actions.
With respect to this question of exemption, this is a matter of initial impression in this State. In viewing this matter we note that sections 4321, 4331 and 4332 of title 42 of the United States Code are analogs of ECL 8-0101, 8-0103 and 8-0109. This issue of exemption has been raised under the Federal statutes and it has been held that where the Federal Environmental Protection Agency is involved in regulatory activities necessarily concerned with environmental consequences, the agency is not obligated to issue a separate and distinct impact statement, since to do so would curtail seriously such environmental protection activity; if, in fact the agency fails to give ample environmental consideration, then such failure may be judicially reviewed; State of Wyoming v Hathaway (525 F2d 66, 71). In addition, where an agency is engaged primarily in an examiriation of environmental questions, and substantive and procedural standards insure adequate consideration of environmental issues, then a formal compliance with the filing of a environmental impact statement pursuant to section 4332 of title 42 of the United States Code insofar as the Federal Environmental Protection Agency is concerned is not a necessary consideration and functional compliance will be deemed sufficient (Environmental Defense Fund v Environmental Protection Agency, 489 F2d 1247.)
The regional office of the Department of Environmental Conservation, after completion of the 1975 sanitary survey of the area of the Great South Bay, a portion of which is the subject matter of this action, met with officials of the towns, the plaintiffs herein, and advised them of the results of the survey as well as the recommendations that were made by the regional office to the Commissioner of Environmental Conser *609 vation that the commissioner classify certain shellfish lands as uncertified. The regional office also advised the towns of a 1976 analysis and similar recommendations made by said office to the commissioner. On March 17, 1977 there was presented at a public hearing held by State Senator Owen H. Johnson, 4th Senatorial District, regarding Federal/State standards regulating the clamming industry, a statement on behalf of the New York State Department of Environmental Conservation, which statement reiterated the recommendation for closure made by the regional office in 1975 and 1976. These presentations afforded plaintiffs ample opportunity to present their views and dispute any proposed administrative change envisioned by the commissioner.
The argument of the commissioner, therefore, that he should be exempt in the within instance from filing an environmental impact statement and from conducting the necessary public hearing pursuant to notice in accordance with the provisions of ECL 8-0109 is persuasive. He is charged by statute with conducting necessary testing procedures of shellfish lands; once he has determined that the lands are not fit for the harvesting of shellfish for human consumption, then he is obliged to issue the necessary orders uncertifying such lands for the taking of shellfish. There exists no doubt that he is, in such instance, necessarily concerned with public health consequences; and he should not be obliged to cease in the middle of such shellfish land certification proceedings in order to conduct hearings bearing upon the nature and effect of his actions.
We now address ourselves to the merits of the actions in question. The plaintiffs contend:
(1) That the test standard utilized by the Department of Environmental Conservation is unconstitutional and invalid;
(2) that assuming that said testing standard to be valid, the methods of implementing such standard utilized by the said Department of Environmental Conservation are arbitrary, capricious and invalid in that they do not provide for a scientific and systematic examination of the waters for the purpose of determining their suitability for shellfish; and
(3) that, therefore the determination by the commissioner declaring certain shellfish lands uncertified is illegal, null and void.
The testimony adduced at the trial from witnesses introduced by all parties reflects that the coliform standard of *610 testing, an indicator test, is internationally recognized as a scientific procedural method for determining the presence of pollution in water; and that the MPN (most probable number) methodology constitutes the most accurate testing procedure presently available to ascertain the presence of harmful human pathogens in shellfish. Testimony further indicated that, in the within instance, the Department of Environmental Conservation utilized a confirmed total coliform standard and in addition used the faecal coliform method of evaluation with respect to the waters in question. While various alternative methods of testing were described and discussed in testimony, including the testing of bottom sediment, the shellfish themselves, and the water by methods different than that of the coliform test, for the presence of harmful organisms, such testing procedures so offered as alternative methods were not recognized either because there existed no valid criteria in administering the test, or there existed no valid criteria for evaluating the results of such testing procedures. Such alternative methods of testing further were demonstrated as being either economically unfeasible or scientifically unacceptable.
The burdqn of establishing that the standard in question is illegal rests with the plaintiffs. I find that the plaintiffs have wholly failed to establish that the standard utilized by the department is illegal and therefore void in effect. In fact, it has been established that the coliform testing method is the only valid testing standard which may be utilized in a case of this nature. I am well aware that the standard has been criticized over a long period of time. I am also aware that the utilizing of the standard has been subjected to various updating procedures and methodology during the period in which it has been employed.
There is no doubt that various steps are being taken to develop alternative valid test criteria and to develop more precise and rapid analytical tests for the purpose of detecting toxins and organisms harmful to humans. While the present coliform indicator tests well may be restricting the use of areas that are in fact safe, I merely note that there exists no test other than the coliform indicator test which has the credentials of valid criteria, standardized methodology and economy.
The trial testimony further demonstrates that past outbreaks of various diseases have been associated with the harvesting of shellfish in waters having a higher reading than *611 70 MPN per 100 milliliters; all available scientific evidence reveals no recourse but to continue the utilization of the coliform indicator standard. While there may exist other possible procedures more valid in both their criteria and methodology, the scientific community has yet to develop such procedures to the degree that they are accepted as valid.
Accordingly, I hold that the standard utilized by the Department of Environmental Conservation is valid, a proper testing standard and in no way is unconstitutional as being violative of due process.
The plaintiffs further assert that the testing methodology adopted by the Department of Environmental Conservation is invalid as being unscientific, and therefore incapable of accurately assessing the quality of the shellfish lands in question; they contend that the orders of the commissioner uncertifying the shellfish lands, now in issue, for the harvesting of shellfish, are therefore invalid, arbitrary and capricious.
Addressing myself, then, to the actions of the commissioner, the initial question is whether such actions were either administrative or quasi-judicial in nature. The promulgation of rules by a governmental agency constitutes an administrative action (Matter of County of Cayuga v McHugh, 4 NY2d 609; Board of Trustees of Inc., Vil. of Old Westbury v Department of Environmental Conservation, 67 Misc 2d 180; see, also, Triolo v Johnson, 65 Misc 2d 424, affd 40 AD2d 953). The actions of the commissioner in uncertifying the shellfish lands in question were administrative acts, therefore, and not quasi-judicial determinations.
Since this matter involved an administrative determination, no hearing was necessary before action was taken by the commissioner; the procedure employed in formulating and adopting such administrative orders is not amenable to attack upon due process grounds; the "substantial evidence” test is not applicable; and I am not limited to considering evidence submitted to the Department of Environmental Conservation, but may consider, de novo, any issues of fact relating to the propriety of such actions taken (Matter of Iona Coll., 65 Misc 2d 329; 8 Weinstein-Korn-Miller, NY Civ Prac, par 7803.07; see, also, Matter of County of Cayuga v McHugh, supra; Matter of Mandle v Brown, 5 NY2d 51, 65).
In reviewing the determinations of the commissioner, the proper test to be utilized is whether his actions were arbitrary and capricious, i.e., whether the action in question, "should *612 have been taken, or is justified * * * and whether the administrative action is without foundation in fact.” (Matter of Pell v Board of Educ., 34 NY2d 222, 231, citing 1 NY Jur, Administrative Law, § 184, p 609.)
The question for determination is whether there exists a rational basis for the orders closing the shellfish lands, since the review being made is not one involving a determination made after a quasi-judicial hearing required by law or statute; in any event rationality is the basis of review under both the "substantial evidence” rule and the "arbitrary and capricious” standard (Matter of Pell v Board of Educ., supra, p 231; Matter of Colton v Berman, 21 NY2d 322, 329; Matter of 125 Bar Corp. v State Liq. Auth., 24 NY2d 174, 178).
The evidence received at trial discloses that the testing procedures utilized by the Department of Environmental Conservation are derived from those procedures prescribed by the National Shellfish Sanitation Program, Manual of Operations, Part I, Sanitation of Shellfish Growing Area — 1965 Revision, published by United States Department of Health, Education and Welfare, Public Health Service, Division of Environmental Engineering and Food Protection, Shellfish Sanitation Branch (defendants’ Exhibit A in evidence). This manual establishes that a condition absolute for the certification and approval of shellfish lands, based upon a sanitation survey of an area, shall be that the median coliform MPN of the water shall be less than 70 per 100 milliliters.
Comparing these criteria as established by the National Shellfish Sanitation Program with the methods of testing utilized by the department in this instance, I am satisfied that the testing criteria and methodology of sampling comport with such recognized standards contained in defendants’ Exhibit A. The frequency of testing, the physical obtaining of water samples, the initial refrigerated storage of the samples; the laboratory testing of the samples and the ultimate analysis of the results all complied with acceptable scientific procedures.
I would note at this point that ECL article 17, Water Pollution Control, is inapplicable with respect to the certifying of shellfish lands under ECL article 13. Trial testimony made it readily apparent that the standards set forth in ECL 17-0301 (subd 5, par c, cl [4]) applied only to the question of classifying waters, which classification was last done in the Great South Bay in 1965; that such classification concerns itself with the quality of the water and not with the quality of *613 the shellfish therein; and that, accordingly, there existed no requirement that defendants comply with said ECL article 17 insofar as testing criteria were concerned with respect to uncertifying certain waters for the harvesting of shellfish.
I hold, therefore, that the defendants have fully complied with the provisions of ECL 13-0307; that the testing of water samples utilizing the coliform testing standard was validly undertaken, was directly related to a public health hazard as determined by both Federal and State authorities, and was based upon scientific standards of testing utilizing the coliform testing methodology.
I further determine that the action of the commissioner in issuing the orders, effective May 20, 1977, closing the shellfish lands in question, was not arbitrary and capricious, but was based upon a deliberate determination as reflected in the testing procedures and the intensive analysis undertaken of the waters in question. I find, therefore, based upon all of the evidence adduced at trial, that the orders of the commissioner had a rational basis for their issuance.
Based upon all of the foregoing, there exists no basis for my considering any of the additional remedies sought by the plaintiffs in Action No. 2.
In conclusion, there is no doubt that the action undertaken by the Department of Environmental Conservation will have an adverse economic impact both upon those who are engaged in the shellfish harvesting and upon those who are engaged in ancillary and service industries involving such harvesting. In closing approximately 1,500 acres in the Great South Bay, the commissioner has brought the total number of acres now closed to shellfish harvesting to approximately 3,100 acres. The dilemma that has been created brings into sharp focus the many problems resulting from the encroachment of an urbanized society upon an industry having an historical significance of over three hundred years in the bay.
While I have been concerned in determining these actions with the problem of the application of suitable criteria to gauge such encroachment in terms of shellfish lands, the greater issue posed by uncontrolled pollution has not been addressed. In essence, I have been dealing with effects and not causes.
It is small consolation to a bayman who earns his livelihood by shellfish harvesting'to tell him that more precise criteria may allow the opening of lands now closed to harvesting; in *614 fact this may not be the case, regardless of whatever criteria is used, if the Great South Bay continues to be used as the repository for society’s waste products. I would further note that even in the attempt to remove the pollutants from the waters of the Great South Bay by the utilization of sewage disposal systems involving treatment plants, the concomitant problem of the removal of ground water from the tributaries flowing into the Great South Bay may well result in an even greater danger to the ecological balance which allows shellfish to reproduce and develop in their natural environment. (See Environmental Defense Fund v Costle, 439 F Supp 980, wherein the Honorable John R. Bartels has directed that the Federal Environmental Protection Agency submit a supplemental environmental impact statement evaluating the effect of the removal of the ground waters from the Great South Bay, by virtue of the collection system of the Southwest Sewer District, inter alia, upon the shellfish industry in both Nassau and Suffolk Counties.)
To hold the Department of Environmental Conservation accountable for the enormity of the problems which beset the bay, however, is to deny the reality of the conditions which have been created and have been allowed to exist, resulting in the polluting of such a great natural resource, which renders it a public health hazard. To address this entire issue as a matter for judicial intervention and remedy does not in any way resolve the dilemma that has been created; I am of the opinion that only concerted action, both legislative and executive in the public sector, and industry-wide in the private sector, together with the utilization of vast expenditures of both private and public funds, must be undertaken to correct those conditions which are unquestionably eroding and destroying an irreplaceable resource.
Settle one consolidated judgment dismissing, in both Actions Nos. 1 and 2, all causes of action of the plaintiffs.