OPINION OF THE COURT
Kenneth K. Rohl, J.
The defendant is charged with one felony count and 15 *382 misdemeanor counts[1] resulting from his allegedly polluting and endangering the environment by illegally discharging and disposing of identified and proscribed hazardous wastes, to wit, methylene chloride and methyl ethyl ketone (see, ECL 27-0903; 6 NYCRR 366.4).
Defendant is the owner-operator of Jetson Air Interiors (doing business as Jets Air Center, Inc.), an airplane refurbishing business which provides, among its other services, for the repainting of the exterior surfaces of privately owned airplanes. As a first step in the repainting process, methylene chloride is used to strip the old paint off of the aircraft and the then bared metal surfaces are acid etched and cleaned with methyl ethyl ketone prior to any paint spraying.
In essence, the indictment charges that between February 1, 1984 and December 1, 1984 the defendant improperly and unlawfully disposed of liquid and solid waste resulting from the paint-stripping/cleaning process in violation of New York’s Environmental Conservation Law when he discharged the liquid waste into the soil and/or drainage system and placed any solid waste into the Dempsey dumpster used for ordinary garbage removal.
Methylene chloride and methyl ethyl ketone are but two of several hundreds of chemical substances formally listed as hazardous wastes in 6 NYCRR part 366 (see, 6 NYCRR 366.4). That list, adopted by the Commissioner of Environmental Conservation (Commissioner) and filed with the Secretary of State on February 1, 1984, forms the basis for all prosecutions for the illegal possession, disposal and dealing in hazardous wastes.
*383 Defendant seeks a dismissal of the various charges upon multiple claims that the list of hazardous wastes and criminal sanctions set forth in New York State’s Environmental Conservation Law are unconstitutional. Before framing the specifics of defendant’s various constitutional challenges, however, a short history of the ECL is necessary.
HISTORICAL BACKGROUND
The passage of the Federal Resource Conservation and Recovery Act of 1976 (RCRA; 42 USC §§ 6901-6987, and the regulations thereunder 40 CFR, ch I, parts 260-271) established the first comprehensive program for the designation, listing and regulation of hazardous wastes.
Critical to the operation of this program are 42 USC § 6926 and 40 CFR part 271 which provide, in essence, the mechanism whereby each of the individual States could, at their option and in lieu of the Federal program, ultimately assume responsibility for the issuance of hazardous waste permits and the enforcement of ecologically damaging disposal of hazardous wastes. Benefits to a State which establishes a Federally approved comprehensive hazardous waste management program include Federal grants-in-aid; access to Federal technical expertise and sole control over the enforcement thereof with the concomitant elimination of secondary regulation by the Federal Government (42 USC §§ 6902, 6926; 40 CFR 271.1 et seq.). However, as discussed, infra, the mere approval of a State program does not totally divest the Federal Government of future control over that State’s hazardous waste management or give that State unbridled discretion in its enforcement procedures. (40 CFR 271.22; 42 USC § 6926 [e].)
In relevant part, 42 USC § 6921 (a) provides: "Not later than eighteen months after October 21, 1976, the Administrator shall, after notice and opportunity for public hearing, and after consultation with appropriate Federal and State agencies, develop and promulgate criteria for identifying the characteristics of hazardous waste, and for listing hazardous waste, which should be subject to the provisions of this sub-chapter * * * Such criteria shall be revised from time to time as may be appropriate” (emphasis added).
42 USC § 6926 further provides that: "Not later than eighteen months after October 21, 1976, the Administrator, after consultation with State authorities, shall promulgate guide *384 lines to assist States in the development of State hazardous waste programs.”
In addition, Federal regulations mandated that: "[t]he State program must control all the hazardous wastes controlled under 40 CFR Part 261 and must adopt a list of hazardous wastes and set of characteristics for identifying hazardous wastes equivalent to those under 40 CFR Part 261.” (40 CFR 271.9; emphasis added.)
Opting for a program consistent with the RCRA, New York enacted ECL article 27, title 9 (eff Sept. 1, 1978) with the expressed purpose of "regulatjmg] the management of hazardous waste (from its generation, storage, transportation, treatment and disposal) in this state and to do so in a manner consistent with public law 94-580, the Federal Resource Conservation and Recovery Act of 1976 hereinafter referred to as 'RCRA’ ” (ECL 27-0900, eff Sept. 1, 1978) and the Environmental Conservation Law provided the procedural mechanism whereby New York would adopt, as a minimum, the Federal list of hazardous wastes, to' wit: "Not later than six months after the promulgation of the regulations for the identification and listing of hazardous wastes by the administrator as provided in RCRA, section 3001, the commissioner [of the New York State Department of Environmental Conservation] shall promulgate regulations in a manner consistent with the state administrative procedure act, setting forth the criteria for identification or listing, and a list of, hazardous wastes which shall be as promulgated by the administrator. These criteria and the accompanying list shall identify the particular hazardous wastes which shall be subject to this title” (ECL 27-0903 [1], as originally enacted eff. Sept. 1, 1978; emphasis added).
After nationwide public hearings, the Federal Government, effective November 19, 1980, promulgated regulations for identifying hazardous wastes and published a list of proscribed substances. This action in turn triggered the provisions of ECL 27-0903 (1) and 27-0900, mandating that New York adopt these regulations and list within six months.
On April 22, 1981, the New York State Department of Environmental Conservation (DEC) filed a notice of proposed agency action (3 [issue 16] NY St Register [Apr. 22, 1981], at 24) indicating that it intended to promulgate environmental hazardous waste regulations that included, among other items, the incorporation by reference of the Federal list of hazardous *385 wastes as set forth in 40 CFR part 261. Notice was also given that the proposed regulations would add "to the U.S. E.P.A.’s listing of hazardous wastes * * * nine categories defining PCB wastes” and listed locations and times for State-wide public hearings to be held in June and July 1981.
On July 21, 1981 enforcement provisions were added to the Environmental Conservation Law (L 1981, ch 719, eff Sept. 1, 1981) which provided felony and misdemeanor criminal sanctions for the illegal possession, transportation or disposal of and the unlawful dealing in hazardous wastes (ECL art 71, tit 27).
Concerned that New York had not yet adopted the Environmental Protection Agency’s (EPA) list of hazardous wastes, chapter 719 added a new subdivision (4) to ECL 27-0903 which stated: "The commissioner shall immediately promulgate and implement, as regulations, those hazardous wastes and acute hazardous wastes listed, or identified by characteristics in regulations promulgated by the administrator as provided in section 3001 of RCRA, which regulations are in effect on the effective date of this subdivision, in order to provide reasonable and adequate protection to the lives, safety and health of the people of the state.” (L 1981, ch 719, § 7.)
Also, as part of this same bill and in an obvious reference to the on-going administrative process begun with public notice issued by the DEC on April 22, 1981, the Legislature mandated that:
"This act shall take effect immediately provided:
"(a) Section seven [ECL 27-0903 (4)] shall expire on the date that the commissioner of environmental conservation promulgates a list of hazardous wastes and acute hazardous wastes otherwise pursuant to the provisions of subdivision one, two and three of section 27-0903 of the environmental conservation law”. (L 1981, ch 719, § 17 [a].)
In compliance with the above enactment the Commissioner, on September 11, 1981, filed emergency regulations (see, State Administrative Procedure Act § 202 [2] [c]) with the Secretary of State to permit the immediate prosecution of violators of the hazardous waste statutes. Public notice of this action (3 [issue 39] NY St Register [Sept. 30, 1981], at 6-7) stated: "During the 1981 legislative session, the New York State Legislature has adopted amendments to Title 27 of Article 27 of the Environmental Conservation Law creating felony penalties for illegal disposal of hazardous wastes. Recognizing that *386 Part 366 will not be ready for promulgation in time to permit immediate enforcement of the new statute, the amendments provide that the department shall immediately adopt the identification and listing of hazardous wastes appearing in analogous Federal regulations, 40 CFR 261, replacing the Federal listing with Part 366 when the latter is ready for promulgation later this fall. The present emergency action implements this legislative mandate. Emergency promulgation is required to prevent a significant time lapse between the effective date of the statute and of the regulations.” The notice went on to state that the emergency action was intended as a permanent rule and that similar to his April 22, 1981 filing, the Commissioner would, via this emergency rule, likewise adopt the Federal list of hazardous wastes by means of incorporation.
Thereafter, on January 8, 1982, the DEC adopted and filed hazardous waste regulations (6 NYCRR part 366) with the Secretary of State with public notice advising that part 366 incorporated by reference the list of hazardous wastes found in 40 CFR part 261 (4 [issue 7] NY St Register [Feb. 17, 1982], at 11). A copy of that Federal list was not filed with the Secretary of State at this time.
On July 27, 1982, ECL 27-0900 was amended by adding the following: "Nothing in this title shall authorize the department to adopt or amend any rule or regulation in a manner less stringent than provided in RCRA” and ECL 27-0903 (1) was amended to read as follows: "Not later than six months after the promulgation of the regulations for the identification and listing of hazardous wastes by the administrator as provided in RCRA, section 3001, the Commissioner shall promulgate regulations in a manner consistent with the state administrative procedure act, setting forth the criteria for identification and listing of hazardous wastes. Based on these criteria, the Commissioner shall promulgate a list of hazardous wastes and shall identify hazardous waste by characteristic, as both are promulgated by the administrator. The list of hazardous wastes and the identification of hazardous waste by characteristic shall determine those hazardous wastes which shall be subject to this title” (emphasis added).
The memorandum filed in support of these amendments states:
"These amendments result from negotiations with U.S. EPA concerning the delegation of the administration of the federal *387 hazardous waste program to New York. To receive such a delegation, federal law (RCRA) requires state programs to be consistent with and substantially equivalent to the federal program as promulgated.
"(a) Section 1 clarifies that the Department’s program must be at least as stringent as the federal program. This is an absolute requirement for any state to receive authorization to administer the federal program. This amendment will assist in the interpretation of any provisions of Article 27, Title 9, which might otherwise have been interpreted to allow the promulgation of a less stringent requirement.” (Governor’s program bill, L 1982, ch 858; emphasis added.)
Thereafter, in People v Dommermuth Petroleum Equip. & Maintenance Corp. (County Ct, Rensselaer County, Dec. 13, 1982, mot to dismiss appeal granted 93 AD2d 917; People v Dommermuth, County Ct, Albany County, Dec. 12, 1982, mot to dismiss appeal granted 93 AD2d 917)[2] defendants claimed that their alleged criminal violations of ECL article 27 must be dismissed upon the grounds that the incorporation by reference of the Federal list of hazardous wastes was unconstitutional in light of NY Constitution, article IV, § 8, which provides: "No rule or regulation made by any state department * * * [or] officer * * * shall be effective until it is filed in the office of the department of state. The legislature shall provide for the speedy publication of such rules and regulations by appropriate laws.”
Relying on Matter of New York State Coalition of Public Employers v New York State Dept. of Labor (89 AD2d 283, affd 60 NY2d 789) the court sustained defendant’s arguments and dismissed the charges upon a finding that the New York State Labor Commissioner’s incorporation by reference of United States OSHA regulations violated due process requirements of NY Constitution, article IV, § 8 by failing to provide a proper notice of the conduct to be prohibited.
In affirming the lower court, the Court of Appeals stated (60 NY2d, at p 791): "One of the purposes behind section 8 of article IV was to insure the existence of a common and definite place where the exact content of rules and regulations, including any changes, might be found. (People v Cull, 10 NY2d 123, 128.) Apart from contravening this purpose, the rule proposed by the commissioner violates the plain language *388 of section 8, which requires all rules and regulations to be 'filed in the office of the department of state’ before they become effective. The OSHA regulations have not been filed.”
In immediate response to the Dommermuth decisions (supra), the Commissioner, on December 23, 1982, filed a copy of the then existing United States EPA regulations and list as had been previously incorporated by reference in 6 NYCRR part 366. Subsequent public notice of this filing (5 [issue 15] NY St Register [Apr. 13, 1983], at 71) stated: "The filing does not add to or in any way modify the existing regulation. It merely provides the explicit language of that which was heretofore incorporated by reference. The exclusive purpose of this notice is to ensure that the terms that are incorporated by reference are more readily available for public access.”
In People v Harris Corp. (104 AD2d 130, lv denied 64 NY2d 1019) defendant was charged with hazardous waste violation both "pre” and "post” December 23, 1982. The court dismissed the charges holding that pre-December 23, 1982 violations were unconstitutional as a result of the incorporation by reference of the Federal list and that post-December 23, 1982 violations were likewise unconstitutional because the December 23, 1982 filing did not serve to legitimatize the Commissioner’s January 1982 action since the December filing did not comply with the rule-making provisions of the State Administrative Procedure Act requiring filing within 180 days after publication of the notice of the proposed rule making. In other words, the filing of the list on December 23, 1982 occurred more than 180 days after the January 8, 1982 incorporation by reference of the Federal rules.[3]
In direct response to Harris, the Commissioner on February 1, 1984, without prior public hearing, amended 6 NYCRR 366.4 to specifically enumerate the list of hazardous wastes; repealing the then existing subdivisions of section 366.4 which had incorporated the Federal list by reference and filed said list with the Department of State.
Notice was thereafter published in the New York Register (vol 6 [issue 8], Feb. 22, 1984, at 6) which stated in relevant part: "Pursuant to the provisions of the State Administrative Procedure Act, Notice is hereby given of the following action:
*389 Action taken: Amendments to Parts 365 and 366 of Title 6 NYCRR.
Statutory authority: Environmental Conservation Law, Sections 27-0903, 27-0907 and 3.0301.2 (m).
Subject: Standards applicable to generators of hazardous waste and lists of hazardous waste.
Purpose: To clarify the storage limits applicable to generators of hazardous waste and to add to our regulations the lists of hazardous waste which were originally incorporated by reference.”
As against the preceding history, it is clear that as of January 30, 1984 there existed no validly filed list of hazardous wastes pursuant to which any criminal actions could be brought against any individual who failed to properly dispose of ecologically damaging wastage. (Mountain View Coach Lines v Storms, 102 AD2d 663 [2d Dept] [doctrine of stare decisis requires trial courts in the Second Department to follow precedents set by the Appellate Division of another department until the Court of Appeals or the Appellate Division, Second Department, pronounces a contrary rule]; see also, People v J. R. Cooperage Co., 127 Misc 2d 161.)
However, in the instant case, the criminal violations are alleged to have occurred after the February 1, 1984 filing of an actual list of hazardous wastes and the publication of such 21 days later.

The First Issue: Was The February 1, 1984 List of Hazardous Wastes Constitutionally Promulgated Without Prior Public Hearing?

The currently existing list of hazardous wastes was promulgated by the Commissioner, on February 1, 1984, without prior public hearing, pursuant to ECL 3-0301 (2) (m) which provides that in order for the Commissioner to fulfill his mandate of insuring the "quality of our environment” (ECL 1-0101) he shall be authorized to: "[a]dopt such rules, regulations and procedures as may be necessary, convenient or desirable to effectuate the purposes of this chapter.”
Defendant now claims that the Commissioner’s failure to hold a public hearing (ECL 3-0301 [2] [a]; State Administrative Procedure Act § 202 [1]) prior to the amendment of 6 NYCRR 366.4 renders the list of hazardous wastes unconstitutional. These statutes variously state in relevant parts:
"2. To further assist in carrying out the policy of this state *390 * * * the department, by and through the commissioner, shall be authorized to:
"a. With the advice and approval of the board, adopt, amend or repeal environmental standards, criteria and those rules and regulations having the force and effect of standards and criteria to carry out the purposes and provisions of this act. Upon approval by the board of any such environmental standard, criterion, rule or regulation or change thereto, it shall become effective thirty days after being filed with the Secretary of State for publication in the 'Official Compilation of Codes, Rules, and Regulations of the State of New York’ published pursuant to section 102 of the Executive Law. This provision shall not in any way restrict the commissioner in the exercise of any function, power or duty transferred to him and heretofore authorized to be exercised by any other department acting through its commissioner to promulgate, adopt, amend or repeal any standards, rules and regulations. No such environmental standards, criterion, rule or regulation or change thereto shall be proposed for approval unless a public hearing relating to the subject of such standard shall be held by the commissioner prior thereto not less than 30 days after date of notice therefor, any provision of law to the contrary notwithstanding. Notice shall be given by public advertisement of the date, time, place and purpose of such hearing. Members of the board shall be entitled to participate in such hearing and opportunity to be heard by the commissioner with respect to the subject thereof shall be given to the public.” (ECL 3-0301 [2] [a].)
"1. Prior to the adoption, amendment, suspension or repeal of any rule as to which a hearing is required by any statute, an agency shall give notice, or cause such notice to be given, and hold a public hearing as follows:” (State Administrative Procedure Act § 202 [1], as in effect on Feb. 1, 1984).[4]
At the heart of defendant’s argument is his claim that hearing requirement of ECL 3-0301 (2) (a) supersedes the nonhearing provisions of ECL 3-0301 (2) (m) insofar as the Commissioner’s failure to hold such public hearings precluded defendant from presenting data as to whether all or any of the items on the list should be classified as hazardous wastes prior to the final drafting of the proposed rules and regulations.
*391 The court would initially note that subdivisions (a) through (d) of the hazardous waste list as filed on February 1, 1984 (6 NYCRR 366.4 [a]-[d]) copy the Federal list set forth in 40 CFR 261.30 through 261.33. On the other hand, subdivision (e) of the State list added "Wastes containing polychlorinated biphenyls” (PCB’s) specifically enumerating 11 such substances although these were not listed as hazardous wastes on the then existing Federal list.
The underlying rationale and purpose of the State Administrative Procedure Act is to establish uniform conduct among the various agencies of the State in their establishing rules and regulations vis-á-vis "the develop[ment] of suitable procedural safeguards determined to be necessary when viewed in the light of such agencies’ statutory responsibilities.” (Villani v Berle, 91 Misc 2d 603, 606 [Bracken, J.].) However, the act in question, and more specifically, section 202 thereof, does not create an absolute right to a public hearing in all actions by administrative agencies. (Villani v Berle, supra.)
Inherent to a determination as to whether a public hearing should have been held is a threshold question as to the true extent of the State’s power to manage its own ecology without Federal intervention. Asked alternatively, has State law been preempted by Federal law in the management of hazardous wastes and, if so, to what extent?
Federal law may preempt State law in any of three circumstances: First, where Congress, in enacting a Federal statute, has explicitly defined the extent to which it intends to preempt State law (Jones v Rath Packing Co., 430 US 519; Shaw v Delta Air Lines, 463 US 85). Second, when it is clear, even in the absence of preemptive language that Congress has intended to occupy an entire field of regulation to the total exclusion of the States (Fidelity Fed. Sav. & Loan Assn. v de la Cuesta, 458 US 141; Rice v Santa Fe Elevator Corp., 331 US 218). Lastly, even where Congress has not expressly displaced State law entirely, it may nonetheless preempt it to the extent it actually conflicts with Federal law when it is impossible for an individual to comply with both Federal and State law (Florida Avocado Growers v Paul, 373 US 132) or when the State law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress” (Hines v Davidowitz, 312 US 52, 67; Michigan Canners & Freezers Assn. v Agricultural Bd., 467 US 461; Capital Cities Cable v Crisp, 467 US 691; *392 Silkwood v Kerr-McGee Corp., 464 US 238; Lawrence County v Lead-Deadwood School Dist., 469 US —, 105 S Ct 695).
Regarding this last point, a "pragmatic effort [must be made] to harmonize state and federal powers”. (California Liq. Dealers v Midcal Aluminum, 445 US 97, 109; Bacchus Imports v Dias, 468 US 263; Battipaglia v New York State Liq. Auth., 745 F2d 166 [2d Cir].)
The preemption doctrine was considered by the Court of Appeals in People v Shapiro (50 NY2d 747), which held that eavesdropping warrants issued in a prostitution case were invalid and that the fruits thereof must be suppressed to the extent that since CPL 700.05 was read to permit authorization of the wiretaps for crimes not involving the use of force or any danger to life or limb "it contravened the requirements of section 2516 of the Federal statute” (supra, p 765). In so concluding, the court stated (pp 762-763): "Congress, in enacting title 3 of the Omnibus Crime Control and Safe Streets Act of 1968, relied upon the broadest reach of its commerce clause powers, in large part to impose upon the States for the minimum constitutional criteria for electronic surveillance legislation mandated by Berger v New York (388 US 41) and Katz v United States (389 US 347). But the legislative intent was not to supersede State regulation of these matters entirely; the grant of enabling power to the States in section 2516 makes this much clear. For the statute recognizes that a State is free to either adopt procedures and standards more restrictive than those imposed by the Federal act, or, if it desires, to prohibit wiretapping within its borders altogether * * * On the other hand, under pre-emption principles, any State law drawn more broadly than title 3’s standards runs afoul of the supremacy clause (US Const, art VI, cl 2; see Tribe, American Constitutional Law, p 379). Our inquiry, therefore, focuses on whether the State statute at issue 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.’ ” The answer is that it does.
Interestingly, the Shapiro court suppressed only the end product of the wiretap but did not invalidate the eavesdropping statute as being preempted by Federal law. Indeed, inherent in the opinion is the court’s recognition that to the *393 extent that State and Federal laws were harmonious they would continue to coexist side by side.[5]
In other words, where there exists a permissive Federal statute, the State’s authority is preempted only to the extent that it fails to comply with the minimal standards set forth by Congress. In this regard, the court will construe a statute to dovetail with the Federal minimums rather than striking it as unconstitutional. "It is with great reluctance and as a last resort that the courts will strike down a solemn legislative enactment on the ground that it conflicts with the state or federal Constitutions.” (McKinney’s Cons Laws of NY, Book 1, Statutes § 150.)
In the instant case, it is clear that while Congress did not choose to occupy the field to the total exclusion of the States, it did choose to establish minimum ecological standards and preempt the States from establishing less stringent rules.
The undisputed clarity of this Congressional intent is set forth in 42 USC § 6929 which states: "Upon the effective date of regulations under this subchapter no State or political subdivision may impose any requirements less stringent than those authorized under this subchapter respecting the same matter as governed by such regulations, except that if application of a regulation with respect to any matter under this subchapter is postponed or enjoined by the action of any court, no State or political subdivision shall be prohibited from acting with respect to the same aspect of such matter until such time as such regulation takes effect. Nothing in this chapter shall be construed to prohibit any State or political subdivision thereof from imposing any requirements, including those for site selection, which are more stringent than those imposed by such regulations” (amended as of Oct. 21, 1980; emphasis added).[6]
Indeed, 40 CFR 271.9, dealing with State-administered programs, provides: "Requirements for identification and listing *394 of hazardous wastes. The State program must control all the hazardous wastes controlled under 40 CFR Part 261 and must adopt a list of hazardous wastes * * * equivalent to those under 40 CFR Part 261” (emphasis added).
40 CFR 271.21 further mandates that whenever the EPA revises its regulations, any "authorized State program which requires revision because of a Federal program change to this part or to 40 CFR Parts 124, 260-266 or 270 shall be modified within one year (or two years if a State statutory amendment is required) of the date or promulgation of the Federal regulation. Authorized States shall [sic] one year (two years if a statutory amendment is required) from the effective date of self-implementing RCRA statutory amendments to modify their programs.” (40 CFR 271.21 [e] [2].)
Finally, the code provides that the EPA "Administrator may withdraw program approval when a State program no longer complies with the requirements of this subpart, and the State fails to take corrective action” (40 CFR 271.22 [a]; emphasis added).
Simply stated, the above-quoted sections give effect to the recent revolution to protect our environment and establish a Federal protective umbrella which the States may not make porous by establishing less restrictive guidelines or enforcement.
That New York State itself has recognized the extent of Federal preemption is clear from ECL 27-0900 (amended as of July 27, 1982) which decrees: "Nothing in this title [Industrial Hazardous Waste Management] shall authorize the department to adopt or amend any rule or regulation in a manner less stringent than provided in RCRA ” (emphasis added).
It is thus absolutely clear that the Commissioner was mandated to adopt, as a minimum, the Federal list of hazardous wastes.
Against this backdrop we can now address the question as to whether a public hearing must have first been held prior to the adoption and filing of the hazardous waste list.
As stated, supra, the uncontroverted purpose of a public hearing is to provide a forum whereby concerned citizens can provide input for the final drafting of proposed rules and regulations which might affect the public’s future actions. However, that right is not unfettered and will only be available where the public hearing can possibly affect the final actions of the public agency.
*395 In the instant case it is clear that the holding of a public hearing would not and could not have affected subdivisions (a) through (d) of the list of hazardous wastes filed by the Commissioner. Any failure by New York to adopt the Federal list would have put the State’s program in noncompliance for its failure to establish Federally accepted minimum standards and further placed it in jeopardy of having its authorization withdrawn with the attendant loss of Federal moneys and other technical benefits.
Thus, with respect to 6 NYCRR 366.4 (a) through (d) the holding of public hearing in this State would have been both meaningless and the court would note, repetitive since such hearings were originally mandated as a condition precedent to the adoption of the Federal list. (42 USC § 6921 et seq.)
With regard to subdivision (e) of the promulgated State list which added 11 categories of polychlorinated biphenyls (PCB’s), the question as to whether the filing of this subdivision violated the public hearing requirements of State Administrative Procedure Act § 202 (1) is not before this court and will not now be decided.
The clear rule to be extracted from this case is that where the Commissioner is mandated to adopt Federal regulations as part of the State’s own regulations he may do so, without public hearing, pursuant to ECL 3-0301 (2) (m).
Accordingly, I find that subdivisions (a) through (d) of the list of hazardous wastes adopted and filed by the Commissioner of February 1, 1984 (6 NYCRR 366.4 [a]-[d]) are constitutional.

The Second Issue: Are The Felony Provisions Of ECL 71-2713 (7) Vague And/Or Overbroad?

ECL 71-2713 (7) provides:
"No person shall * * *
"Knowingly dispose of more than fifteen hundred gallons or fifteen thousand pounds, whichever is less, of an aggregate weight of hazardous wastes without authorization”.
Violation of this subdivision is a class D felony punishable by either imprisonment of up to seven years, a fine of up to $100,000 or double the amount of defendant’s gain whichever is higher, the amount of cost of restoring to its original state the area where the hazardous waste was unlawfully disposed of or any combination of such fine, cost or restoration and imprisonment (ECL 71-2721 [2]).
*396 Defendant contends that subdivision (7) is unconstitutionally (1) vague insofar as it fails "to define or fix the time frame” in which the illegal act must be committed and (2) overbroad insofar as the use of an "aggregate weight” standard permit the disposal of a large amount of highly diluted hazardous waste to be punished more severely than the disposal of a small amount of highly concentrated waste.
In support of his claim of vagueness, defendant alleges that the statute’s failure to specifically state that disposal must be "per day” or "per week” or "pursuant to a common scheme” or "part of a scheme or business” or any other such term does not give a person of ordinary intelligence fair notice of the conduct that is forbidden (Papachristou v City of Jacksonville, 405 US 156) and impermissibly allows the prosecuting authorities to arbitrarily add up small amounts of disposed waste until the 1,500-gallon threshold is exceeded and then, under a theory of "continuing offense” prosecute the violator for a felony rather than a misdemeanor.
Simply stated, for the defendant to sustain his challenge he must demonstrate, beyond a reasonable doubt (People v Pagnotta, 25 NY2d 333; People v Berck, 32 NY2d 567; Hotel Dorset Co. v Trust for Cultural Resources, 46 NY2d 358; McKinney’s Cons Laws of NY, Book 1, Statutes § 150) that ECL 71-2713 (7) (1) does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) encourages arbitrary and discriminatory enforcement by prosecuting officials against particular groups or individuals " 'deemed to merit their displeasure’ ” (Kolender v Lawson, 461 US 352, 360; see, People v Berck, supra).
In the instant case, defendant is charged with illegally disposing of more than 1,500 gallons of hazardous waste resulting from several unrelated paint stripping jobs which occurred between February 1, 1984 and December 31, 1984.
The District Attorney alleges that he has an absolute right to combine the various disposals together in order to exceed the 1,500 threshold and charge defendant with a felony under a theory of "continuous offense”.
On the other hand, defendant claims that if the District Attorney is possessed of an unfettered right to proceed under a "continuous offense” theory at his whim and caprice, then the statute violates the proscription against arbitrary and discriminatory enforcement.
*397 Curiously, both the defendant and the District Attorney rely on People v Cox (286 NY 137); People v Daghita (276 App Div 20, mod 301 NY 223), and People v Schwenk (92 Misc 2d 331) (all larceny cases) to sustain their respective positions vis-á-vis "continuing offense”.
In People v Cox (supra, at pp 142-143) the rule as to continuing offenses is set forth as follows: "As long as the larceny is held to be pursuant to a single intent, and one complete, illegal scheme, it matters not the length of the period over which the takings continued. Thus, successive takings lasting for a period of about three years * * * or for a period of about two years * * * have been held to constitute a single larceny. If several takings are pursuant to several different intents and each illegal plan is a new and separate enterprise, each taking may only be prosecuted as a single larceny, for it is only those stealings which are prompted by a single intent and pursuant to a single plan which may be accumulated and prosecuted as one larceny. The principle of law involved has been stated as follows: 'Where the property is stolen from the same owner and from the same place by a series of acts, if each taking is the result of a separate, independent impulse, each is a separate crime; but if the successive takings are all pursuant to a single, sustained, criminal impulse and in execution of a general fraudulent scheme, they together constitute a single larceny, regardless of the time which may elapse between each act’ ” (emphasis added).
As further pointed out in People v Schwenk (supra, at pp 339-340, citing People v Daghita, supra): "the law is well settled that it is a question of fact for the jury to decide, if appropriate, satisfactory and adequate evidence is adduced at trial, whether the crime charged is a continuous crime as well as the defendant’s guilt or innocence thereof.” (People v Cox, supra; People v Daghita, supra.)
In People v Perlstein (97 AD2d 482 [2d Dept]), the defendant was charged with grand larceny in the second degree as a result of his selling round-trip tickets to numerous persons for three different charter flights to Israel which he did not intend to provide or complete. The court dismissed the charge as duplicitous holding that the District Attorney improperly aggregated the amount of numerous separate larcenies to reach the $1,500 threshold. In so concluding, the court synthesized the law regarding continuing offense as follows (p 484): *398 "Cases have generally required that the aggregated takings be from a single owner or source * * * or, if from different owners, that the larceny occur at the same time and place, and pursuant to a unitary plan or design, such that the taking may be said to constitute but a single criminal transaction * * * Since the takings in issue here were not from a single owner or source and did not occur at the same time and place, it follows, ex necessitate, that this count of the indictment was improperly constituted and must be dismissed.”
Further evidence of the court’s continued intent to restrict a "continuing offense” theory to crimes against one person over a period of time or against multiple persons at the same time and place is illustrated in People v Bornstein (96 AD2d 722).
In Bornstein, the court held that the monetary damage caused by defendant’s slashing of tires on nine different automobiles at different times could not be aggregated to charge a defendant with criminal mischief in the second degree. The court wrote (96 AD2d 722, supra): "There is no case law construing the propriety of combining the damage caused by several incidents of criminal mischief to arrive at the statutory amount. However, we may apply analogous cases concerning the crime of larceny. It has been held that 'separate thefts from various owners could not be considered together in finding a single criminal plan permitting conviction of grand larceny, first degree.’ * * * Here, although the tire slashings may have been the product of a single intent and design, they were separate acts against various owners and, therefore, they cannot be considered together to constitute a single crime of criminal mischief in the second degree.”
That the Legislature intended to define those areas where it would permit the aggregation of separate minor crimes to permit felony charges is evidenced by the promoting gambling in the first degree (Penal Law § 225.10), scheme to defraud in the first degree (Penal Law § 190.65) and criminal usury in the first degree (Penal Law § 190.42) statutes. The gambling statute requires as part of a bookmaking or lottery or policy scheme or enterprise that multiple bets be taken in one day; the scheme to defraud statute requires a showing of a "systematic ongoing course of conduct” and the usury statute a showing that the illegal loans were part of a "scheme or business of making or collecting usurious loans.”
As against that background, it is clear that no such parameters exist in the Environmental Conservation Law. Except as *399 precluded by the Statute of Limitations (CPL 30.10) there is no requirement that the illegal disposal occur within any fixed period of time or that it be part of an ongoing scheme or business or plan to do so. Indeed, the statute as written appears to give unfettered discretion to the prosecutor to pick and choose those whom he wishes to prosecute as felons by arbitrarily deciding whether or not to proceed under a theory of continuing offense.
However, the aforestated conclusion does not mandate a finding of unconstitutionality where the statute in question can be read to give its ambiguous language a meaning that may stand without conflict with the fundamental law (McKinney’s Cons Laws of NY, Book 1, Statutes § 150 [c]).
Clearly, the statute in question permits the prosecution of a single disposal in excess of 1,500 gallons, or by analogy to the aforecited cases, an aggregated disposal in excess of 1,500 gallons where the aggregation results from the wastage related to various stages of a single job or the wastage from several jobs all occurring at the same place and time.
Affixing such an interpretation to the statute under challenge renders defendant’s claim of vagueness moot.
Applying this test to the facts in the instant case, it is clear that the District Attorney has overstepped his limits with regard to the first count which aggregates separate allegedly illegal disposals unrelated by job, place or time.
Accordingly, count No. 1 of the indictment is dismissed as duplicitous (People v Perlstein, supra).
While the above holding makes unnecessary a resolution of defendant’s claim that ECL 71-2713 (7) is overbroad as a result of its "aggregate weight” standard, the court would note that in any event this claim is without merit.
It is well established that the Legislature may choose to base the degree of criminal punishment upon an aggregate weight standard (People v Daneff, 30 NY2d 793, remittitur amended 31 NY2d 667, cert denied 410 US 913; People v Morales, 63 AD2d 935).
It is true that "some rather remarkably unjust results” (United States ex rel. Daneff v Henderson, 501 F2d 1180, 1185 [2d Cir]) might be possible under the existing law where a person can dispose of 1,499 gallons of pure deadly toxic waste and only be charged with a misdemeanor while another person can mix one gallon of toxic waste with 1,499 gallons of water and be charged with a class D felony. These considera *400 tions are within the province of the Legislature, however, and are directed to its attention for any action it may choose or not choose to take.
Other summary claims that ECL article 71, title 27 are unconstitutional for vagueness and/or overbreadth are found to be without merit. (People v Roberto H., 67 AD2d 549; People v Alexander, 88 AD2d 749.)
SUMMARY
(1) The list of hazardous wastes adopted filed by the Commissioner on February 1, 1982 without a prior public hearing complied with all requisite statutes and is constitutional to the extent that it adopted those hazardous wastes specifically enumerated in 40 CFR part 261.
(2) ECL 71-2713 (7) may be prosecuted under a continuing offense theory only if the evidence establishes that the aggregation of 1,500 gallons of disposed hazardous waste results from the various stages of a single job for the same customer or from several jobs from various customers all occurring at the same place and time.
(3) The use of the term "aggregate weight” in ECL 71-2713 (7) does not render that statute unconstitutional as being overbroad.
(4) Summary claims that ECL article 71, title 27 are unconstitutional for vagueness and/or overbreadth are found to be without merit.

. Specifically, the indictment charges the defendant with unlawful disposal of hazardous wastes in the first degree (count No. 1; class D felony); unlawful dealing in hazardous wastes in the second degree (count No. 2); knowingly violating the prohibition against disposal of hazardous wastes without a permit (counts Nos. 3 and 5); recklessly violating the prohibition against disposal of hazardous wastes without a permit (counts Nos. 4 and 6); negligently violating the prohibition against disposal of hazardous wastes without a permit (count No. 7); knowingly violating the prohibition against using a paint source for the discharge of industrial waste or other wastes into the waters of the State without a SPOES permit (counts Nos. 8 and 10); recklessly violating the prohibition against using a paint source for the discharge of industrial waste or other wastes into the waters of the State without a SPOES permit (counts Nos. 9 and 11); knowingly violating the general prohibition against pollution (count No. 12); recklessly violating the general prohibition against pollution (count No. 13); knowingly violating 6 NYCRR 703.6 (count No. 14); recklessly violating 6 NYCRR 703.6 (count No. 15), and using a name with intent to deceive (count No. 16).

. See also, the later case of People v Attco Metal Indus., 122 Misc 2d 689.

. While the decision makes note of the fact that an issue as to the need for a public hearing was raised, it is clear that the court did not decide this issue choosing instead to base the list infirmity on the untimely filing.

. This section was substantially amended on March 13, 1984 effective July 11, 1984 to detail notice and public hearing requirements.

. In People v Principe (65 NY2d 33), the court again addressed the scope of eavesdropping permitted under the New York statute and reaffirmed the principles enunciated in Shapiro (50 NY2d 747).

. As of November 8, 1984, this section was further amended to add the following sentence to the end of the above-quoted paragraph: "Nothing in this chapter (or in any regulation adopted under this chapter) shall be construed to prohibit any State from requiring that the State be provided with a copy of each manifest used in connection with hazardous waste which is generated within that State or transported to a treatment, storage, or disposal facility within that State.”